1

2

3

4

5

6

7

8                      **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10

11   EDER G. HERRERA,                    Case No. SACV 12-1650 SS

12              Plaintiff,               **ORDER (1) GRANTING IN PART AND
                                         DENYING IN PART DEFENDANTS'**
13        v.                             **MOTION FOR SUMMARY JUDGMENT
                                         [Dkt. No. 105] AND (2) DENYING**
14   CITY OF BREA, et al.,               **DEFENDANTS' MOTION TO STRIKE
                                         PLAINTIFF'S CD EXHIBITS AND**
15              Defendants.              **"MATERIAL FOR ATTORNEY'S EYES
                                         ONLY"  [Dkt. No. 119]**
16

17                                 **I.**

18                           **INTRODUCTION**

19

20        Eder  G.  Herrera  ("Plaintiff")  filed  the  Second  Amended

21   Complaint  ("SAC")  on  March  27,  2013,  alleging  violations  of  his

22   civil  rights  under  42  U.S.C.  §  1983  and  various  state  law  claims

23   arising  from  his  2011  arrest  and  subsequent  release  from  custody

24   for  the  murder  of  his  mother  and  brother.  (Dkt.  No.  28).[1]  On

25   February  3,  2015,  Defendants  City  of  Brea  (the  "City"),  Brea

26   _____

27   [1]  On  December  22,  2014,  the  Parties  stipulated  to  the  voluntary
     dismissal  of  five  individually-named  Defendants  in  the  SAC,  (Dkt.
     No.  84),  which  the  Court  ordered  on  December  23,  2014.  (Dkt.
28   No.  86).

Police Department ("BPD"), BPD Chief of Police Jack Conklin ("Conklin") (collectively, the "Policy Making Defendants"), and BPD Officers Ruben Alonzo ("Alonzo") and Philip Rodriguez ("Rodriguez") (collectively, the "Individual Defendants") filed a Motion for Summary Judgment, Or, In The Alternative, For Summary Adjudication, ("MSJ," Dkt. No. 105-1"), and a Separate Statement of Uncontroverted Facts and Conclusions of Law. ("Statement of Uncontroverted Facts" or "SUF," Dkt. No. 105-2). In support of the MSJ, Defendants filed the declarations of witness Marc Lopez (Dkt. No. 105-3; BPD Chief Jack Conklin (Dkt. No. 105-10); BPD Crime Scene Investigator Suzette Young (Dkt. No. 106); BPD Detectives Ruben Alonzo (Dkt. No. 105-8), John Alan Hoetker (Dkt. No. 105-4) and Philip Rodriguez (Dkt. No. 105-7); BPD Corporal Cynthia Gilbert (Dkt. No. 105-5); BPD Officer Mario Michael Vaughan (Dkt. No. 105-6); Orange County Senior Deputy District Attorney Philip Gundy (Dkt. No. 105-11); police procedure expert Timothy T. Williams (Dkt. No. 105-9); and counsel Jennifer Petrusis.[2] ("Petrusis Decl. I," Dkt. No. 105-12). Defendants also filed a Request for Judicial Notice. ("RJN," Dkt. No. 105-13).[3]

---

[2] Defendants lodged separately audio recordings identified as Exhibits 29, 31 and 38 to the Petrusis I declaration. (See Dkt. No. 108).

[3] The documents for judicial notice are copies of: (1) the City's police department manual, a BPD press release, Yorba Linda City Council minutes for November 1, 2011, a transcript of the Yorba Linda City Council meeting on the same date (collectively, the "Municipal Documents"), and a portion of Plaintiff's responses to Conklin's interrogatories. To the extent that the Municipal Documents are public records the accuracy of which cannot be reasonably contested, Plaintiff's Request for Judicial

2

Plaintiff filed an Opposition to the MSJ on February 17, 2015, ("Opp.," Dkt. No. 109), including a combined Statement of Genuine Issues in Response to Defendants' Statement of Alleged Uncontroverted Facts and Plaintiff's Own Statement of Genuine Facts in Opposition to Defendants' Motion for Summary Judgment (collectively, "Statement of Genuine Disputed Facts" or "GDF," Dkt. No. 114). In support of the Opposition, Plaintiff filed the declarations of Plaintiff Eder Herrera (Dkt. No. 111), police practices expert Roger Clark (Dkt. No. 110), counsel John Burton ("Burton Decl. I," Dkt. No. 113), and legal intern Maya Ragsdale.[4] (Dkt. No. 112). Plaintiff also filed an application for an order sealing documents designated as "Material for Attorneys' Eyes Only," (Dkt. No. 116), which was granted on February 24, 2015. (Dkt. No. 120). That same day, Plaintiff filed under seal the confidential documents referenced in the "attorney's eyes only" application as exhibits to another declaration by counsel John Burton. ("Burton Decl. II," Dkt. No. 121).

Also on February 24, 2015, Defendants filed a Reply in support of the MSJ, ("Reply," Dkt. No. 118), including a

---

Notice is GRANTED. See Fed. R. Evid. 201(b); see also Shaw v. Hahn, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995) (a court may take judicial notice of matters of public record). The Court will construe Plaintiff's discovery responses as exhibits in support of Defendants' MSJ.

[4] Plaintiff separately lodged audio and video CD recordings identified as Exhibits AA and BB to the Opposition and Exhibit CC to the Ragsdale declaration. (Dkt. No. 115). Counsel John Burton subsequently filed a declaration authenticating the recordings. ("Burton Decl. III," Dkt. No. 122).

3

1  supplemental declaration of counsel Jennifer Petrusis.

2  ("Petrusis Decl. II," Dkt. No. 118-6).  Defendants also filed

3  separate responses to Plaintiff's Response to Defendants'

4  Statement of Uncontroverted Facts, ("D Fact Resp. I," Dkt. No.

5  118-1), and to Plaintiff's Statement of Genuine Facts in

6  Opposition to the MSJ.  ("D Fact Resp. II," Dkt. No. 118-2).  In

7  addition, Defendants filed Evidentiary Objections to the Herrera,

8  Clark and Ragsdale declarations.  ("Herrera Decl. Evid. Obj.,"

9  Dkt. No. 118-3; "Clark Decl. Evid. Obj.," Dkt. No. 118-5;

10 "Ragsdale Decl. Evid. Obj.," Dkt. No. 118-4).  That same day,

11 Defendants filed an "Objection and Motion to Strike Plaintiff's

12 CD Exhibits and 'Material for Attorneys' Eyes Only' Manually

13 Lodged but Untimely Served on Defendants."  ("MTS," Dkt. No.

14 119).  On February 27, 2015, Defendants filed the declaration of

15 counsel Norman A. Dupont in support of the MTS.[5]  (Dkt. No. 123).

16    The Court held a hearing on Defendants' Motions on March 10,

---

[5]  Defendants raise numerous objections to Plaintiff's declarations, often on the grounds that the declarant's statements are irrelevant (see, e.g., Herrera Decl. Evid. Obj. at 2-8), conclusory or speculative (see, e.g., Clark Decl. Evid. Obj. at 3-12), or hearsay.  (See, e.g., Ragsdale Decl. Evid. Obj. at 3-13).  In addition, Defendants object to and move to strike on timeliness grounds Plaintiff's submission of documents for attorney's eyes only and three CDs.  (MTS at 2).  As of the date of this Order, Plaintiff has not filed an Opposition to the MTS.

All evidentiary objections that are not specifically addressed in this Order are DENIED because the evidence they referenced was not material to the Court's decision.  This ruling is without prejudice and with leave to assert the objections again at a later stage in the proceedings.  See PacifiCorp v. Northwest Pipeline GP, 879 F. Supp. 2d 1171, 1194 n.7 & 1214 (D. Or. 2012) (declining to address evidentiary objections where the court would reach the same conclusions whether or not it considered the challenged materials).  To the extent that the Court does rely on any evidence objected to, the objections are overruled.

4

2015.  At the hearing, the Court granted Plaintiff's request to file a supplemental brief addressing recent state law developments concerning the application of the Bane Act, codified at California Civil Code § 52.1.[6]  Accordingly, on March 11, 2015, Plaintiff filed a "Supplemental Declaration of John Burton re Opposition to Defendants' Motion for Summary Judgment on Plaintiff's Supplemental Cal. Civ. Code § 52.1 Claim for Relief." ("Allen Decl.," Dkt. No 136).  On March 12, 2015, Defendants filed a "Reply to Supplemental Declaration of John Burton re: Allen Case and Summary Judgment Motion."  ("Allen Reply," Dkt. No. 128).

For the reasons stated below, Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication, is GRANTED IN PART and DENIED IN PART.  Defendants' Motion to Strike is DENIED.

## II.

### FACTUAL BACKGROUND

On the evening of October 25, 2011, Raquel Estrada and Juan Carlos Herrera, Plaintiff's mother and older brother, were murdered at the home they shared with Plaintiff at 4251 Trix Circle (the "Residence") in Yorba Linda, California (the "Trix

---

[6] Plaintiff explained that the "brief" would be in the form of a letter submitted by counsel in another civil rights case to the California Supreme Court requesting depublication of a recent court of appeal decision.

Circle murders").[7]   BPD Officers under Rodriguez's supervision arrested Plaintiff on October 26, 2011 on suspicion of having committed the murders.   Plaintiff remained in custody until February 3, 2012, when he was released after a high school friend, Itzcoatl Ocampo, who had been arrested for committing other murders while Plaintiff was incarcerated, confessed to the Trix Circle murders.

According to Plaintiff, he left his home on the night of October 25, 2011 at approximately 8:00 p.m. (GDF 2).   After stopping at a Jack-in-the-Box, he called his friend Kourosh Shirazi at 8:32 p.m. in the vicinity of 27860 Aleutia Way in Yorba Linda, where Shirazi lived.   (GDF 5).   Shirazi and his friend Ryan Aubrey arrived at 27860 Aleutia Way approximately ten to twenty minutes after Plaintiff called and found Plaintiff waiting in his car.   (GDF 6).   Aubrey went to bed, and Plaintiff and Shirazi "drove around" smoking marijuana that Shirazi had brought with him in his backpack before they stopped at a Denny's in Norco at around 10:05 p.m.   (GDF 9).   After leaving Denny's at approximately 10:50 p.m., they "drove around some more" smoking marijuana, stopped at a 7-Eleven near Plaintiff's house around midnight, and drove by Trix Circle, where they noted that the cul de sac was taped off and that several police cars were present. (GDF 10-11; Herrera Decl. ¶¶ 17-20).   Plaintiff wanted to avoid the police because he and his family were not in the country

---

[7] According to Plaintiff, his family moved into the Residence, which they rented from the Richardsons, in February 2011. (Herrera Decl. ¶ 11).

legally.  (Id. ¶ 20).  However, Plaintiff gave his cell phone to Shirazi, who called Plaintiff's brother four times without success and Plaintiff's mother once.  (Id. ¶ 21).

Plaintiff states that he and Shirazi then returned to Shirazi's home, where Plaintiff fell asleep on the sofa.  (Id. ¶ 22).  Plaintiff woke up at 5:00 a.m. and went to his car, where he noticed that Shirazi's backpack with the marijuana was still on the back seat.  (Id. ¶ 23).  Plaintiff squatted and put a "little bit of [Shirazi's] marijuana" in a jar, then took the backpack and his trash from Jack-in-the-Box into the garage, including the receipt from Jack-in-the-Box showing when he had bought food there.  (Id. ¶ 24).  Shortly after he began to drive away, he was stopped by several police officers, ordered to get out of the car, and handcuffed.  (Id. ¶ 25).  Alonzo told him that the police were doing a "follow-up investigation on an incident at the house on Trix."  (Id. ¶ 27).  Alonzo asked him whether he had anything at Shirazi's house.  Plaintiff did not tell him about Shirazi's backpack because it had marijuana in it.  (Id. ¶ 28).  After Plaintiff was in handcuffs for approximately an hour, Alonzo arrested him and said that police were investigating a murder.  (Id. ¶ 29).  Five or six hours after his arrest, Plaintiff asked whether his mother and brother were the victims.  (Id. ¶ 30).  When he was told that they were found dead in the Residence, Plaintiff began sobbing.  (Id.).

According to Defendants, just before 11:30 p.m. on the night of the murders, the BPD received a 911 call from an anonymous

caller who said he heard some noises coming from the Residence. (SUF 6). The 911 call was placed from a pay phone approximately one mile from the Residence. (SUF 7). Officers found the bodies of Plaintiff's mother and brother inside the residence. (SUF 8). There was blood at the front doorway of the Residence and a trail of blood led down the hallway from the front door. (SUF 9). There were boot prints throughout the Residence and leading out the back door. (GDF 16). Rodriguez was the lead investigator for the Trix Circle murders, and states that he arrived at the Residence at approximately 12:52 a.m. (SUF 10; Rodriguez Decl. ¶ 10). Alonzo assisted in the investigation, and states that he arrived at the Residence at approximately 1:30 a.m. (SUF 11; Alonzo Decl. ¶ 8).

Shortly after midnight, Plaintiff's neighbor Marc Lopez told BPD Corporal Gilbert that earlier that night, sometime between 9:00 to 9:30 p.m., he heard someone crying out "Help, Help, Help me." (SUF 13; Gilbert Decl. ¶¶ 7-8). Lopez told Gilbert that he ran outside and saw a "male, Hispanic subject who looked like he was dragging something, possibly furniture, into the [R]esidence." (SUF 14). Lopez told Gilbert that the man he saw had the same profile as the son who lived at the residence. (SUF 15).

Detective Stone conducted a tax records search and determined that the property was owned by Michael and Thomas Richardson in Yorba Linda. (Rodriguez Decl. ¶ 14). Detective Hoetker was sent to the Richardson home, where he obtained a copy

1  of the rental agreement that identified the residents as

2  Plaintiff, his mother and his brother. (Id.).

3

4      Through a records check, Rodriguez determined that a 2003

5  Mercedes Benz with license plate number 5WFM969 was registered to

6  "Edgar Herrera," who Rodriguez believed was Plaintiff Eder

7  Herrera. (SUF 21). Using a cell phone number on Herrera's

8  rental application obtained from the owners of the Residence,

9  detectives were able to locate Herrera's cell phone in the area

10 of 27860 Aleutia Way in Yorba Linda. (SUF 22). Alonzo and two

11 other detectives, Hoetker and Crews, arrived at 27860 Aleutia Way

12 at approximately 3:40 a.m., where they saw a black 2003 Mercedes

13 Benz with license plate number 5WFM969 parked in front of the

14 home. As reflected in a contemporaneous police report, Hoetker

15 stated that he used his flashlight to examine the Mercedes and

16 saw what appeared to him to be a silver dollar sized stain that

17 resembled blood on the driver's seat near the center compartment.

18 (SUF 24).[8] (SUF 23).

19 ───────────────────

20 [8]  Plaintiff disputes that there ever was a blood stain and
   contends that Hoetker's report indicating that he had seen a
21 blood stain was not simply erroneous, but a conscious lie.
   Because Plaintiff is the non-moving party, the Court will assume,
22 for purposes of this motion only, that there was no blood in
   Plaintiff's car and that Hoetker's misrepresentation was
23 deliberate. As evidence in support of his position, Plaintiff
   states that Crews, who was watching the scene, said no one looked
24 in the car. (GDF at 6) (citing Crews Dep. at 64-65). When the
   BPD checked the Mercedes following Plaintiff's arrest, there was
25 no spot. (GDF at 6) (citing Alonzo Dep. at 188). Furthermore,
   the BPD criminologist tested the seat and found no indication of
26 cleaning or blood. (Burton Decl. I, Exh. B). The Orange County
   crime laboratory also found no indication of blood anywhere
27 inside the car. (Id., Exh. C). In response to Plaintiff's
   arguments, Defendants note that Crews testified that she did not
28

9

1      At approximately 5:20 a.m., Hoetker saw Plaintiff walk to

2   the Mercedes, open at least two doors and squat down out of

3   sight. (SUF 25). Hoetker and Alonzo saw Plaintiff walk away

4   from the vehicle toward the Aleutia Way home with what appeared

5   to be a bag in his hand. (SUF 26). When Officers stopped

6   Plaintiff at a traffic stop as he drove from the Aleutia Way

7   home, Hoetker purportedly noticed that the possible bloodstain he

8   had seen earlier was no longer present. (SUF 27).

9

10     At the traffic stop, Alonzo told Plaintiff that the police

11  were conducting an investigation of an incident at the Trix

12  Circle Residence.[9]   (SUF 28). Alonzo asked Plaintiff about his

13  whereabouts the night before and certain basic facts about his

14  mother and brother. (SUF 29). Plaintiff told Alonzo that he had

15  last been at his house until 8:00 or 9:00 p.m. the night before.

16  (SUF 31). Alonzo asked Plaintiff if he had taken anything in or

17

18  see Hoetker look into the Mercedes because it would have happened
    after she left her surveillance position. (D Fact Resp. I at 4).
19  Additionally, Exhibit B established that several areas of the
    vehicle demonstrated luminescence consistent with a positive
20  reaction by Bluestar Forensic, indicating the possible presence
    of blood. (Id. at 5). Finally, Defendants state that Exhibit C
21  is irrelevant because it was not provided to Rodriguez until May
    2012, three months after Plaintiff was released from custody.
22  (Id.). While Defendants do not appear to challenge the finding
    that there was in fact no blood in Plaintiff's car, they
23  vigorously maintain that Hoetker's report was in good faith.

24

25  [9] Alonzo states in his declaration that he told Plaintiff that
    the police were "doing a follow-up investigation on an incident
26  at the Residence and were trying to identify anybody who belonged
    to the Residence . . . ."  (Alonzo Decl. ¶ 12).   Plaintiff
27  contends that Alonzo did not inform him that the investigation
    concerned his Residence, and that he thought Alonzo was referring
28  to another house on the block. (Herrera Decl. ¶ 27).

out of his car, and Plaintiff responded the he had only taken his phone. (SUF 34).

After consulting with Rodriguez, Alonzo arrested Plaintiff at Rodriguez's direction. (SUF 36). When Plaintiff asked why he was being placed under arrest, Alonzo responded that police were investigating a murder. (SUF 37). Alonzo wrote in his report dated October 28, 2011 that after he told Plaintiff that it appeared that his mother and brother had been killed, Plaintiff became emotional and cried for a short time. (SUF 38).

During the interview at the station, Plaintiff told Rodriguez and Crews that he left the Residence no later than 8:00 p.m. and stopped by a Jack-in-the-Box between 8:15 and 8:30 p.m. (SUF 39). Plaintiff further told the Officers that he went to the home of his friend Shirazi and estimated his time of arrival as 9:00 p.m. (SUF 40). Plaintiff also told the Officers that he and Shirazi drove around and estimated that they arrived at a Denny's in Corona between 11:30 p.m. and midnight.[10]  (SUF). Herrera also stated during the interview that he and his mother had not been talking for one to two months because they had been arguing about how often he went out of the house. (SUF 43).

\\

\\

---

[10] Hoetker later determined that Plaintiff and Shirazi arrived at a Denny's in Norco around 10:06 p.m. and left at 10:48 p.m. (SUF 42).

BPD Detective Vaughan presented a photographic line-up to Lopez at approximately 9:10 a.m. on October 26, 2011. (SUF 17). The parties dispute what Lopez told Vaughan. Lopez states in his declaration submitted with the MSJ that he told Vaughan that he recognized the person in photograph 2 as the man who he believed he "saw dragging something into the 4251 Trix Circle home and as [his] neighbor." (Lopez Decl. ¶ 5). Lopez also currently states that he "clarified to Detective Vaughan that [he] was identifying both [his] neighbor, i.e., the younger of the two men who lived at the residence, and the person [he] believed [he] saw dragging something into the residence the night before." (Id.). However, Plaintiff challenges the version of events recounted in Lopez's declaration as inconsistent with Lopez's deposition testimony. According to Plaintiff, Lopez's deposition testimony indicates that Lopez told Vaughan that he could not identify the person who he saw pulling something into the house, but that the person in position No. 2 looked like his neighbor.[11] (GDF at 4) (citing Lopez Dep., Burton Decl. I, at 44-55, 115-116).

At approximately 10:14 a.m., Rodriguez and Alonzo interviewed Shirazi at the station. (Alonzo Decl. ¶ 20). Rodriguez and Detective Crews interviewed Plaintiff at approximately 12:15 p.m. (Rodriguez ¶ 25).

---

[11] Again, for purposes of this motion only, the Court will assume that Lopez merely identified the person in position No. 2 as Plaintiff, without stating whether Plaintiff was the man he had seen pulling something into the Residence on the evening of October 25th.

On October 27, 2011, Rodriguez prepared and submitted a Declaration of Probable Cause to the Orange County Superior Court. (SUF 44; Rodriguez Decl. ¶ 30). Rodriguez testified that he relied solely on Alonzo's statements for part of his Declaration. (GDF at 9) (citing Rodriguez Dep. at 219). According to Rodriguez,

> Among the key facts contained in the Probable Cause Declaration were: (1) Information about the crime scene and location; (2) contact with the Residence owners and information obtained about the tenants, including the younger Mr. Herrera; (3) information obtained from various interviews of neighbors, including the neighbor Marc Lopez who was interviewed by Corporal Gilbert; and (4) the witness identification (by Marc Lopez) of Herrera as the person Lopez saw dragging something into the house, which was consistent with someone dragging a body and leaving a trail of blood.

(Rodriguez Decl. ¶ 31). The Declaration erroneously stated that Plaintiff had no emotional response to being told the identity of the murder victims. (SUF 46; Rodriguez Decl. ¶ 33). On October 27, 2011, Orange County Senior Deputy District Attorney Howard Gundy filed a criminal complaint against Plaintiff charging him with the murders of his mother and brother. (Gundy Decl. ¶ 3).

\\

\\

13

1    Alonzo conducted a further investigation after the
2    Declaration of Probable Cause was filed. (Alonzo Decl. ¶¶ 25-
3    28). BDP Officers and Detectives obtained surveillance footage
4    from various locations that Plaintiff claimed to have visited on
5    the night of the Trix Circle murders and from the businesses near
6    where the 911 call was made. (SUF 48). On January 18, 2012,
7    Rodriguez and two BPD detectives interviewed Plaintiff's family
8    after Plaintiff's aunt contacted the BPD about Ocampo, who by
9    then had been arrested for the murders of homeless people in
10   Orange County. (SUF 56). Rodriguez interviewed Ocampo on
11   January 31, 2012 and February 1, 2012. In the second interview,
12   Ocampo confessed to murdering Plaintiff's mother and brother.
13   (SUF 57). Herrera was released from custody on February 3, 2012.
14   (SUF 58).

16                              **III.**

17                      **PLAINTIFF'S CLAIMS**

19   The SAC, as amended by the dismissal of certain
20   individually-named Defendants, collectively raises four claims
21   against Policy Making Defendants City of Brea, the BPD, and BPD
22   Chief Conklin, and Individual Defendants BPD Officers Alonzo and
23   Rodriguez.[12]   First, Plaintiff contends that the Individual

24   _____
     [12] It is not entirely clear from the SAC whether BPD Police Chief
25   Conklin is sued in his individual or official capacity. However,
     the only explicit allegation mentioning Conklin in the SAC occurs
26   in Claim Two, captioned "Entity Liability," which states that
     "[D]efendants City of Brea and BPD and the policy maker, Chief
27   Conklin . . . allowed constitutional violations as alleged
     herein." (SAC ¶ 40). Furthermore, Plaintiff concedes in his
28   Opposition to the MSJ that he is not seeking punitive damages

                                14

Defendants violated his Fourth, Fifth and Fourteenth Amendment rights to be free from detention and arrest not based on probable cause, and from unwarranted incarceration. (SAC at 8-9). Second, Plaintiff argues the Policy Making Defendants violated his right to be free from "unreasonable searches and seizures, and prosecutions based on false and misleading reports . . . ." (Id. at 9). Third, Plaintiff alleges that the City and the Individual Defendants violated his state law constitutional and statutory rights to be free from unlawful seizure and his right to bodily integrity in violation of California Civil Code sections 52 and 52.1 (Id. at 9-10). Fourth, Plaintiff raises a state law tort claim alleging that the Individual Defendants falsely arrested and imprisoned him when they arrested him without probable cause and caused his continued incarceration based on an allegedly falsified declaration of probable cause. (Id. at 10).

**IV.**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants assert two primary grounds in support of their entitlement to summary judgment. First, the Individual Defendants contend that they did not violate Plaintiff's constitutional rights as alleged in Claim One. Defendants argue

against Conklin, in contrast to Individual Defendants Alonzo and Rodriguez, and "does not oppose the entry of summary adjudication on that claim only." (Opp. at 25). Accordingly, the Court concludes that Conklin is sued in his official capacity only and is properly grouped with the City and the BPD as the "Policy Making Defendants."

that they had probable cause to make the initial detention and arrest. Additionally, Defendants state that they cannot be held liable for any alleged "malicious prosecution" because the Orange County District Attorney ("OCDA") conducted his own investigation before determining that probable cause existed. (Id. at 11-16). Finally, even assuming a constitutional violation occurred, the Individual Defendants maintain that they are entitled to qualified immunity. (Id. at 17). Second, the Policy Making Defendants argue that Plaintiff has not identified a policy or practice in Claim Two that would give rise to municipal liability under section 1983. (MSJ at 7-10). According to Defendants, because Plaintiff's federal claims against both the Policy Making and Individual Defendants fail, the Court should decline to exercise pendent or supplemental jurisdiction over the state law claims asserted in Claims Three and Four. (Id. at 10).

In the alternative, Defendants raise two grounds for summary adjudication in the event that the Court decides to exercise supplemental jurisdiction over the state law claims. First, the City and the Individual Defendants claim that the state law civil rights claim in Claim Three fails because Plaintiff cannot show that Defendants used "threats, intimidation or coercion" in the alleged violation of his constitutional rights, as required by California Civil Code sections 52.1. (Id. at 19). Second, the Individual Defendants contend that the state law tort action for false arrest and false imprisonment in Claim Four fails because

1  Defendants had probable cause to arrest Plaintiff and probable

2  cause did not dissipate until Ocampo confessed in February 2012.

3  (Id. at 21-22).

4

5      Finally, the Individual Defendants argue that Plaintiff's

6  claim for punitive damages against them cannot stand because

7  Plaintiff does not have any evidence to establish that they acted

8  with malice.[13]  (Id. at 23-24).

9

10                              V.

11      STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

12

13      Pursuant to Federal Rule of Civil Procedure 56, a moving

14  party's entitlement to summary judgment depends on whether the

15  evidence, viewed in the light most favorable to the nonmoving

16  party, contains genuine issues of material fact.  See Adams v.

17  Synthes Spine Co., LP, 298 F.3d 1114, 1116-17 (9th Cir. 2002).

18  The moving party bears the initial burden of production and the

19  ultimate burden of persuasion to establish the absence of a

20  genuine issue of material fact.  See Celotex Corp. v. Catrett,

21  477 U.S. 317, 323 (1986).  "Material facts are those which may

22  affect the outcome of the case."  Long v. County of Los Angeles,

23  442 F.3d 1178, 1185 (9th Cir. 2006).  "A dispute as to a material

24  fact is genuine if there is sufficient evidence for a reasonable

25

26  [13] Conklin joined in this argument, but Plaintiff clarified in his
    Opposition that he is not seeking punitive damages against
27  Conklin and does not oppose summary adjudication on Defendants'
    punitive damages prayer as applied to Conklin only.  (Opp. at
28  25).

                              17

1    jury to return a verdict for the non-moving party." Id. "In

2    order to carry its burden of production, the moving party must

3    either produce evidence negating an essential element of the

4    nonmoving party's claim or defense or show that the nonmoving

5    party does not have enough evidence of an essential element to

6    carry its ultimate burden of persuasion at trial." Nissan Fire &

7    Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102 (9th Cir.

8    2000).

9

10       If the moving party carries its burden of production, the

11   nonmoving party must go beyond the pleadings and produce evidence

12   to support its claim or defense that shows a genuine issue for

13   trial. Id. at 324; see also Anderson v. Liberty Lobby, Inc., 477

14   U.S. 242, 248 (1986). The moving party is entitled to summary

15   judgment if the nonmoving party "fails to produce enough evidence

16   to create a genuine issue of material fact . . . ." Nissan Fire,

17   210 F.3d at 1103.

18

19       In ruling on a motion for summary judgment, a court may not

20   weigh the evidence or make credibility determinations. See

21   Anderson, 477 U.S. at 255. Rather, "the evidence of the non-

22   movant is to be believed, and all justifiable inferences are to

23   be drawn in his favor." Id. However, this general rule gives

24   way in certain situations. For instance, more than a

25   "metaphysical doubt" is required to establish a genuine issue of

26   material fact, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

27   Corp., 475 U.S. 574, 586 (1986), and "the non-moving party must

28   present more than a 'mere . . . scintilla of evidence' to defeat

1  a motion for summary judgment." <u>International Church of
2  Foursquare Gospel v. City of San Leandro</u>, 673 F.3d 1059, 1068
3  (9th Cir. 2011) (quoting <u>Anderson</u>, 477 U.S. at 252); <u>see also</u>
4  <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000)
5  ("A scintilla of evidence or evidence that is merely colorable or
6  not significantly probative does not present a genuine issue of
7  material fact."). Moreover, conclusory assertions unsupported by
8  evidence are insufficient to defeat a motion for summary
9  judgment. <u>Clouthier v. Contra Costa County</u>, 591 F.3d 1232, 1252
10  (9th Cir. 2010); <u>see also</u> <u>United States v. $133,420.00 in U.S.</u>
11  <u>Currency</u>, F.3d 629, 638 (9th Cir. 2012) ("'[A] conclusory, self-
12  serving affidavit, lacking detailed facts and any supporting
13  evidence, is insufficient to create a genuine issue of material
14  fact.'") (quoting <u>FTC v. Publ'g Clearing House, Inc.</u>, 104 F.3d
15  1168, 1171 (9th Cir. 1997)); <u>FTC v. Neovi, Inc.</u>, 604 F.3d 1150,
16  1159 (9th Cir. 2010) ("Specific testimony by a single declarant
17  can create a triable issue of fact, but the district court was
18  correct that it need not find a genuine issue of fact if, in its
19  determination, the particular declaration was 'uncorroborated and
20  self-serving.'" (quoting <u>Villiarimo v. Aloha Island Air, Inc.</u>,
21  281 F.3d 1054, 1061 (9th Cir. 2002)).
22  \\
23  \\
24  \\
25  \\
26  \\
27  \\
28  \\

1                                  **VI.**

2                              **DISCUSSION**

3

4    **A.    Genuine Issues of Material Fact Preclude Summary Judgment On**

5         **Claim One**

6

7         In Claim One, Plaintiff alleges that the Individual

8    Defendants violated his constitutional rights "to be free from

9    detention and arrest not based on reasonable suspicion or

10   probable cause, and prolonged his incarceration by lying and

11   concealing material facts, causing his malicious prosecution."

12   (SAC at 9).  Defendants argue that (1) Rodriguez had probable

13   cause to direct Alonzo to arrest Plaintiff, (2) the prosecutor's

14   independent determination to file a criminal complaint against

15   Plaintiff constituted an "intervening cause" insulating

16   Defendants from liability, and (3) there is no evidence that

17   Defendants prosecuted Plaintiff "with malice and with the purpose

18   of denying [him] his constitutional rights."  (MTD at 14).

19   Defendants further contend that they are entitled to qualified

20   immunity.  (Id. at 17-18).

21

22        **1.   False Arrest**

23

24        The Fourth Amendment accords the right to protection from

25   arrest without probable cause.  Beck v. Ohio, 379 U.S. 89, 91

26   (1964); United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir.

27   2007).  Thus, "[a] claim for unlawful arrest is cognizable under

28   § 1983 as a violation of the Fourth Amendment, provided the

                                   20

arrest was without probable cause or other justification." Dubner v. City and County of San Francisco, 266 F.3d 959, 964 (9th Cir. 2001). An arrest is supported by probable cause if, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime." Grant v. City of Long Beach, 315 F.3d 1081, 1085 (9th Cir. 2002) (internal quotations, brackets and citation omitted); see also Lopez, 482 F.3d at 1072 ("Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."). However, "'[a]s a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'" United States v. Ortiz-Hernandez, 427 F.3d 567, 574 (9th Cir. 2005) (quoting Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir. 1988)).

Objective facts and circumstances known to the officer at the time of the arrest determine its validity. Beck, 379 U.S. at 96. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," regardless of the arresting officer's subjective reason for making the arrest. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Accordingly, "the question of whether a reasonable officer could have believed probable cause (or reasonable suspicion) existed to justify a search or an

arrest is 'an essentially legal question' that should be determined by the district court at the earliest possible point in the litigation." Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) (internal citation omitted). "Where the underlying facts are undisputed, a district court must determine the issue on motion for summary judgment." Id. The existence of probable cause defeats a § 1983 claim for false arrest. Hart v. Parks, 450 F.3d 1059, 1069 (9th Cir. 2006).

Defendants contend that Rodriguez had probable cause to order Alonzo to effectuate Plaintiff's arrest because (1) Rodriguez personally investigated portions of the murder, including visiting the Residence on the night of the Trix Circle murders; (2) Corporal Gilbert told Rodriguez that an eyewitness saw someone dragging something into the house; (3) Detective Hoetker reported seeing what he believed was a blood stain in the car driven by Plaintiff; (4) Hoetker also determined that the possible bloodstain was no longer visible after Plaintiff opened the car doors and squatted out of sight, then walked away with what appeared to be a bag in his hand; and (5) Alonzo told Rodriguez that he believed that Plaintiff lied to him about not taking anything out of the car. (MTD at 2-3).

However, a rational jury could conclude that Rodriguez and Alonzo deliberately ignored evidence that contradicted or undermined their theory that the murderer must be a family member. For example, Lopez, the only eyewitness, admitted in his deposition that it was "very dark" on the night of the murders,

22

so dark that "you couldn't see him [the man pulling something into the Residence], like his face or anything like that," and that the incident was "very quick." (Burton Decl. I, Lopez Dep., at 32). Furthermore, while Plaintiff admits that Lopez's statement provided sufficient grounds for a Terry stop, he also contends that Plaintiff was able to account for his whereabouts on the night of the murders and that his account could be easily verified by documentary and other hard evidence and the testimony of witnesses, such as Shirazi. (Opp. at 14). As Plaintiff notes, "[a] jury could conclude that after the interviews of Shirzai and [Plaintiff], statements already corroborated by the Denny's receipt, any probable cause dissipated for [Plaintiff's] arrest, as it had for Shirazi's." (Id. at 15; see also Clark Decl. ¶ 71 ("In my opinion, by the end of the traffic stop there was no probable cause to arrest Eder for murder as there was no physical evidence located and he accounted for his whereabouts.")).

On summary judgment, the court may not make credibility determinations. Whether or not Plaintiff will ultimately prevail on his false arrest claim at trial, he has presented sufficient evidence on this claim to survive summary judgment. Accordingly, to the extent that Defendants' MSJ is based on the contention that Rodriguez and Alonzo had probable cause to arrest Plaintiff, the MSJ is DENIED.

\\

\\

\\

23

1          **2.   False Imprisonment/Malicious Prosecution**

2

3          Following arrest, "a [pretrial] detainee has 'a

4   constitutional right to be free from continued detention after it

5   was or should have been known that the detainee was entitled to

6   release.'"   Lee v. City of Los Angeles, 250 F.3d 668, 683 (9th

7   Cir. 2001) (quoting Cannon v. Macon County, 1 F.3d 1558, 1563

8   (11th Cir. 1993)); see also Ortiz-Hernandez, 427 F.3d at 574 (a

9   person "must be released from arrest, if previously established

10  probable cause has dissipated" because the "continuation of even

11  a lawful arrest violates the Fourth Amendment when the police

12  discover additional facts dissipating their earlier probable

13  cause").   It has been long settled that "[t]he Constitution does

14  not guarantee that only the guilty will be arrested.  If it did,

15  § 1983 would provide a cause of action for every defendant

16  acquitted -- indeed, for every suspect released."   Baker v.

17  McCollan, 443 U.S. 137, 145 (1979).   However, the "loss of

18  liberty caused by an individual's mistaken [pretrial]

19  incarceration 'after the lapse of a certain amount of time' gives

20  rise to a [false imprisonment] claim under the Due Process Clause

21  of the Fourteenth Amendment."   Lee, 250 F.3d at 683 (quoting

22  Baker, 443 U.S. at 145).

23

24         In the Ninth Circuit, a claim of malicious prosecution is

25  generally not cognizable under section 1983 if process is

26  available within the state judicial system to provide a remedy.

27  Lacey v. Maricopa County, 649 F.3d 1118, 1133 (9th Cir. 2011).

28  The Ninth Circuit has recognized an exception to this general

                                 24

rule and permitted suit under section 1983 when the malicious prosecution is "conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights." Id. (internal quotation marks omitted). "To prevail on a malicious prosecution cause of action in a § 1983 suit, Plaintiffs must show that [Defendants] prosecuted [them] with malice and without probable cause, and that they did so for the purpose of denying [them] equal protection or another specific constitutional right." Id. (internal quotation marks and citation omitted).

Where a prosecutor has filed a criminal complaint, a rebuttable presumption arises that "the prosecutor . . . exercised independent judgment in determining that probable cause . . . existed, thereby breaking the chain of causation between an arrest and prosecution and immunizing investigating officers from damages suffered after the complaint was filed." Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008) (citation and internal quotation marks omitted); see also id. at 865 (explicitly declining to overrule the "rebuttable presumption approach" for malicious prosecution cases "in the Fourth Amendment context"). However, "[m]alicious prosecution actions are not limited to suits against prosecutors but may [also] be brought . . . against other persons who have wrongfully caused the charges to be filed." Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004). The presumption of a "break in the chain of causation" may be rebutted by showing that the defendant compromised the independence of the prosecutor's judgment.

Specifically, "the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." Id. at 1067.   This includes the fabrication of police reports.   See Blankenhorn v. City of Orange, 485 F.3d 463, 482 (9th Cir. 2007) ("A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports.").

Senior Deputy District Attorney Howard Gundy filed a declaration describing the evidence and information that he found persuasive as to a finding of probable cause and affirming that he exercised his "independent judgment in determining whether to charge [Plaintiff] with a criminal complaint." (Gundy Decl. ¶ 8).   However, Plaintiff contends that Rodriguez's October 27, 2011 Probable Cause Declaration, informed in part by information given to him by Alonzo, contained deliberate or reckless falsehoods that resulted in Plaintiff's false imprisonment and prosecution.

In particular, Plaintiff takes issue with Rodriguez's admittedly erroneous statement, based on information provided to him by Alonzo, that when Plaintiff was told "there was a double homicide at his residence, there seemed to be a genuine lack of

concern."  (Opp. at 23) (citing Burton Decl. I, Exh. Q at 5).
Alonzo also reported that Hoetker saw a blood stain on the front
seat of Plaintiff's car, which Plaintiff contends a jury could
find "deliberately false."  (Opp. at 20).  Plaintiff also
contends that Rodriguez falsely represented that Lopez had
affirmatively identified Plaintiff as the person he saw dragging
something into the house on the night of the murders, when in
fact Lopez stated at his deposition that it was dark and he could
not detect facial features.  (Opp. at 15).  Plaintiff further
contends that Rodriguez wrongly accused Plaintiff of lying when
Plaintiff stated that he had gone to his friend Shirazi's house
at 8:30 p.m.  (Opp. at 16).  According to Plaintiff, "there is
literally nothing to implicate [Plaintiff] once the falsehoods
[from Rodriguez's report] are removed."  (Id. at 17).  In
addition, Plaintiff contends that the Declaration of Probable
Cause omitted important facts, such as Lopez's statement to the
Officers that it was dark, or that bloody combat boot prints were
found at the house, or that Plaintiff was found spending the
night at his friend's house, "neither hiding nor fleeing."
(Clark Decl. at 25).  Plaintiff also contends that genuine issues
exist as to whether his continuing incarceration was due to the
Individual Defendants.  (Opp. at 19).

     A reasonable jury could, but would not be required to,
conclude that despite Gundy's assertion to have conducted an
independent investigation, the information supplied by Rodriguez
and Alonzo was sufficient to undermine the independence of the
investigation by the district attorney's office.  That evidence

is enough to survive summary judgment.  Accordingly, to the extent that Defendants' MSJ is based on the argument that the District Attorney's criminal complaint insulated Rodriguez and Alonzo from liability for false imprisonment/false prosecution, the Motion is DENIED.

### 3.   Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  "Whether a public official is entitled to qualified immunity is a question of law." Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 1999).  In analyzing whether qualified immunity applies, a court must determine "whether, taken in the light most favorable to [Plaintiffs], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." Bull v. City and County of San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (internal quotation marks omitted; brackets in original).  A court is not required to address these two inquiries in a particular order, but may instead "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 226.  "But under either prong [of the qualified immunity

analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Tolan v. Cotton</u>, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (qualified immunity cases "illustrate the importance of drawing inferences in favor of the nonmovant" even when the court decides "only the clearly-established prong of the standard").

"For a constitutional right to be clearly established, its contours must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). The Supreme Court has emphasized that a finding that a government official's conduct violates clearly established law requires that "existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft v. al-Kidd</u>, __ U.S. __, 131 S. Ct. 2074, 2083 (2011); <u>see also</u> <u>Sheehan v. City and County of San Francisco</u>, 743 F.3d 1211, 1228 (9th Cir. 2014) ("At this stage of the proceedings, the operative question [re qualified immunity] is whether, again viewing the facts in the light most favorable to [plaintiff], the officers violated a clearly established Fourth Amendment right of which all but the plainly incompetent would have been aware.") (citing <u>Stanton v. Sims</u>, __ U.S. __, 134 S. Ct. 3, 5 (2013)). The dismissal of charges following arrest or a defendant's ultimate acquittal "is not determinative of qualified immunity." <u>Picray v. Sealock</u>, 138 F.3d 767, 772 (9th Cir. 1998).

\\

\\

1    Here, genuine issues of fact remain as to whether the
2    Individual Defendants violated Plaintiff's rights by subjecting
3    him to false arrest, false imprisonment, and malicious
4    prosecution.     The parties dispute whether the investigation
5    conducted by Rodriguez and Alonzo was reasonable.     On these
6    facts, at this stage of the proceedings, it is premature for the
7    Court to decide whether Defendants are entitled, as a matter of
8    law, to qualified immunity.     See Sheehan, 743 F.3d at 1229
9    (determination of entitlement to qualified immunity on summary
10   judgment "premature" where genuine facts remained in dispute as
11   to constitutionality of officers' forced entry).     Accordingly, to
12   the extent that Defendants' MSJ is based on the Individual
13   Defendants' claim to qualified immunity, the Motion is DENIED.

14

15   **B.    Policy Making Defendants City Of Brea, City Of Brea Police**
16         **Department And Chief Conklin Are Entitled To Summary**
17         **Judgment On Claim Two**

18

19   In Claim Two, Plaintiff alleges that the Policy Making
20   Defendants violated his constitutional rights "with deliberate
21   indifference, and conscious and reckless disregard to . . . the
22   right to be free from unreasonable searches and seizures, and
23   prosecutions based on false and misleading reports" by
24   instituting policies and allowing the constitutional violations
25   to occur.     (SAC at 9).   Defendants contend that Plaintiff has
26   failed to show the existence of a policy that caused his
27   injuries, and that the "single incident" at issue in this action

28

-- Plaintiff's allegedly wrongful arrest -- is insufficient, by itself, to constitute a "policy." (MTD at 7-10).

When an individual sues a local government for violation of his constitutional rights, the municipality is liable only if the individual can establish that the local government "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." Galen v. County of Los Angeles, 477 F.3d 652, 667 (9th Cir. 2007) (quoting Monell v. New York City Dep't. of Soc. Servs., 436 U.S. 658, 694-95 (1978)). In Monell, the Supreme Court specifically rejected governmental liability based on the doctrine of respondeat superior. Id. at 691-94. Therefore, a city or county cannot be held liable under section 1983 merely because it employs the individuals who allegedly caused the plaintiff harm. Id.

The policy underlying the plaintiff's injury "need only cause [the] constitutional violation; it need not be unconstitutional per se." Jackson v. Gates, 975 F.2d 648, 654 (9th Cir. 1992). In addition, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." Davis v. City of Ellensburg, 869 F.2d 1230, 1233 (9th Cir. 1989). As the Supreme Court has explained,

\\

\\

1      Proof of a single incident of unconstitutional
2      activity is not sufficient to impose liability under
3      Monell, unless proof of the incident includes proof
4      that it was caused by an existing, unconstitutional
5      municipal policy, which policy can be attributed to a
6      municipal policymaker.  Otherwise the existence of the
7      unconstitutional policy, and its origin, must be
8      separately proved.  But where the policy relied upon
9      is not itself unconstitutional, considerably more
10     proof than the single incident will be necessary in
11     every case to establish both the requisite fault on
12     the part of the municipality, and the causal
13     connection between the "policy" and the constitutional
14     deprivation.

15

16  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)
17  (internal footnote omitted).  However, "[a] municipality also can
18  be liable for an isolated constitutional violation if the final
19  policymaker 'ratified' a subordinate's actions."  Christie v.
20  Iopa, 176 F.3d 1231, 1238 (9th Cir. 1999) (citing City of St.
21  Louis v. Praprotnik, 485 U.S. 112, 127 (1988); compare Davis,
22  869 F.2d at 1233 ("A plaintiff cannot prove the existence of a
23  municipal policy or custom based solely on the occurrence of a
24  single incident of unconstitutional action by a non-policymaking
25  employee.").  "Ordinarily, ratification is a question for the
26  jury."  Christie, 176 F.3d at 1238-39.  "[A]s with any jury
27  question," to defeat a defendant's **motion** for summary judgment,
28  "a plaintiff must establish that there is a genuine issue of

material fact regarding whether a ratification occurred."  Id. at 1239.

Here, Plaintiff does not identify any particular BPD "policy" or practice that allegedly caused him harm.  In his interrogatory response, Plaintiff states that Conklin is liable because he "(1) set in motion a series of acts by his subordinates by allowing two inexperienced and incompetent officers to investigate a challenging 'who-done-it' multiple homicide, (2) knew his subordinates were disregarding a substantial risk of serious harm by jumping to the false and unfounded conclusion that the murders had to have been perpetrated by a household member, and (3) failed to prevent his subordinates from disregarding a substantial risk of serious harm to Plaintiff."  (RJN, Exh. E at 6).[14]  (Opp. at 22).  However, Plaintiff does not allege that Chief Conklin or the BPD overall had a policy or practice of appointing detectives to improperly investigate crimes, or of allowing those detectives and other officers to disregard substantial risks of harm to purportedly innocent parties in murder investigations.  See Saman v. Robbins, 173 F.3d 1150, 1157 (9th Cir. 1999) (affirming grant of summary judgment in favor of City where, "upon careful examination of the record, the evidence reveals no city policy of making illegal arrests").

---

[14] In his Opposition to the MSJ, Plaintiff specifically complains that Conklin "took no action to make sure that this complex double murder, a strange 'who-done-it,' was properly staffed with auxiliary investigators from the office of the Sheriff Coroner, with whom he was then wrangling over the Yorba Linda policing contract."  (Opp. at 22).

Instead, Plaintiff appears to contend that the Policy Making Defendants are liable because Conklin ratified Plaintiff's false arrest and imprisonment. (Opp. at 22) (citing Christie, 176 F.3d at 1238). Even assuming, without deciding, that a local government policymaker's ratification of a subordinate's acts can, in some circumstances, subject the municipality to section 1983 liability, summary judgment is still proper here because Plaintiff has not produced evidence showing that Conklin ratified Rodriguez's decision to have Alonzo arrest Plaintiff. Ratification requires "knowledge of the alleged constitutional violation," i.e., the approval of authorized policymakers of a subordinate's decision "and the basis for it." Christie, 176 F.3d at 1239. However, Plaintiff does not present any evidence showing that Conklin ratified the decision to arrest Plaintiff. Conklin, on the other hand, swears that he did not "participate in the decision to arrest Plaintiff" or communicate with anyone from the OCDA's Office about the decision to file a criminal complaint against Plaintiff. (Conklin Decl. ¶¶ 15-16). At most, the evidence shows that Conklin received one update from Rodriguez and "possibly also from Detective Sergeant Parker," who appointed Rodriguez as the lead investigator in the instant matter, and that he was made aware of, but did not participate in, the drafting of a press release describing Plaintiff as a suspect accused of the murders. (Id. ¶ 15 & Exh. 27). Nothing in the content of those communications would have given Conklin notice of any alleged deficiencies in the investigation. Therefore, Conklin's alleged failure to take action to ensure that the investigation was properly staffed does not constitute

ratification of the violation of Plaintiff's constitutional
rights.

Accordingly, Defendants' MSJ is GRANTED as to the federal
claims against the Policymaking Defendants City of Brea, the BPD,
and Chief Conklin.

**C.   The   Court   Will   Exercise   Pendent   Jurisdiction   Over
      Plaintiff's   State   Law   Claims   Against   The   Individual
      Defendants In Claims Three And Four And Against The City In
      Claim Three**

"A   district   court's   decision   whether   to   exercise
[supplemental] jurisdiction [over state law claims] after
dismissing every claim over which it had original jurisdiction is
purely discretionary." Carlsbad Technology, Inc. v. HIF Bio,
Inc., 556 U.S. 635, 639 (2009); see also In re Digimarc Corp.
Derivative Litigation, 549 F.3d 1223, 1233 n.3 (9th Cir. 2008)
("Despite lacking federal question jurisdiction, a district court
may in some circumstances exercise supplemental jurisdiction over
state law claims which accompanied a dismissed federal claim.")
(citing 28 U.S.C. § 1367). However, the Supreme Court instructs
that "in the usual case in which all federal-law claims are
eliminated before trial, the balance of factors to be considered
under the pendent jurisdiction doctrine -- judicial economy,
convenience, fairness, and comity -- will point toward declining
to exercise jurisdiction over the remaining state-law claims."
Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, the Court is not dismissing the federal claims against the Individual Defendants and therefore exercises its discretion to hear the state-law claims against them in Claims Three and Four as discussed below. In contrast, the Court is dismissing the federal claims against the Policy Making Defendants. The SAC does not raise a state law claim against either Conklin or the BPD, but does allege in Claim Three that the City, alone among the Policy Making Defendants, is liable for violation of California Civil Code 52.1. (SAC at 9). As the Court explains further below, state law provides that the City may be vicariously liable under section 52.1 for the actions of Alonzo and/or Rodriguez. See Cal. Gov't Code § 815.2. Therefore, in the interests of judicial economy and the avoidance of potential inconsistent verdicts or double recovery, the Court will exercise its discretion to hear Plaintiff's section 52.1 claim against the City even though there is no surviving federal claim against the City. See, e.g., Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir. 2001) (noting "general rule" that "the district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, [even though] it cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction") (internal quotation marks and citation omitted; brackets in original); Francis v. Marshall, 684 F. Supp. 2d 897, 913 (E.D. Ky. 2010) (emphasizing "commonsense policies of judicial economy" in deciding to retain jurisdiction over state law claims after dismissal of all federal claims) (internal quotation marks and citation omitted).

1  **D.    The Individual Defendants And The City Are Not Entitled To**
2      **Summary Adjudication On Plaintiff's State Law Civil Rights**
3      **Claim In Claim Three**

4

5      In Claim Three, Plaintiff alleges that the Individual
6  Defendants and, vicariously, the City are liable under California
7  Civil Code sections 52 and 52.1 because they violated his federal
8  constitutional rights with "threats, intimidation or coercion."
9  (SAC at 9).  Defendants argue that even if they violated
10 Plaintiff's constitutional rights, which they deny, Plaintiff has
11 failed to prove that they threatened, intimidated or coerced him
12 and therefore are not liable under section 52.1.  (MTD at 20).

13

14     "California's Bane [Civil Rights] Act provides a private
15 right of action under state law for damages and injunctive relief
16 where a person 'interferes by threats, intimidation, or coercion,
17 or attempts to interfere by threats, intimidation, or coercion,
18 with the exercise or enjoyment by any individual or individuals
19 of rights secured by the Constitution or laws of the United
20 States, or of the rights secured by the Constitution or laws of
21 this state.'"  <u>Green v. City and County of San Francisco</u>, 751
22 F.3d 1039, 1044 n.4 (9th Cir. 2014) (quoting Cal. Civ. Code
23 § 52.1 (2005)).  To prevail on a Section 52.1 claim, a plaintiff
24 must show "an attempted or completed act of interference with a
25 legal right, accompanied by a form of coercion."  <u>Jones v. Kmart</u>
26 <u>Corp.</u>, 17 Cal. 4th 329, 334 (1998); <u>see also</u> <u>Venegas v. County of</u>
27 <u>Los Angeles</u>, 32 Cal. 4th 820, 843 (2004) (the provisions of
28 § 52.1 do not extend to "ordinary tort actions" but "are limited

to threats, intimidation or coercion that interferes with a constitutional or statutory right"); Allen v. City of Sacramento, __ Cal. App. 3d __, 183 Cal. Rptr. 3d 654, 676 (2015), as modified on denial of reh'g ("There are two distinct elements for a section 52.1 cause of action.  A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion.").  "The word 'interferes' as used in [§ 52.1] means 'violates.'"  Barsamian v. City of Kingsburg, 597 F. Supp. 2d 1054, 1064 (E.D. Cal. 2009) (quoting Austin B. v. Escondido Union School Dist., 149 Cal. App. 4th 860, 883 (2007)).  "[U]nder section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion."  Venegas, 32 Cal. 4th at 843.

Several courts have noted that "whether a constitutional violation occurred and whether that violation was accompanied by any threats, intimidation or coercion are separate analytical inquiries (albeit with intertwining facts)."  Barsamian, 597 F. Supp. 2d at 1064; see also Davis v. City of San Jose, __ F. Supp. 3d __, 2014 WL 4772668, at *5 (N.D. Cal. Sept. 24, 2014) ("Although analogous to § 1983, [the Bane Act] is not tantamount to a § 1983 violation [and requires] more than evidence of a violation of rights.").  However, the law regarding the showing necessary to prove coercion appears somewhat unsettled, particularly following the decision in Shoyoye v. County of Los

1 Angeles, 203 Cal. App. 4th 947 (2012), in which a clerical error

2 resulted in the negligent unlawful detention of a prisoner who

3 had been ordered released.   In that case, the state court of

4 appeal determined that section 52.1 "requires a showing of

5 coercion independent from the coercion inherent in the wrongful

6 detention itself."   Id. at 59.   Following Shoyoye, "[t]he federal

7 district courts [have been] split regarding whether Shoyoye

8 applies to all Bane Act claims, and whether a plaintiff bringing

9 a Bane Act claim must introduce independent evidence showing

10 threats, intimidation, or coercion, in addition to showing a

11 constitutional violation."[15]   Lopez v. City of San Diego, 2014 WL

12 7330874, at *14 (S.D. Cal. Dec. 18, 2014) (collecting cases).   As

13 one court explained, "[o]ne line of [federal] cases has held that

14 coercive conduct must be separate from the alleged constitutional

15 violation. . . .   Other courts have concluded that a Bane Act

16 claim may be based on the same coercive conduct as a

17 constitutional claim."   Brown v. City and County of San

18 Francisco, 2014 WL 1364931, at *17 (N.D. Cal. Apr. 7, 2014)

19 (finding more persuasive, "[i]n the absence of binding

20 authority," cases permitting Bane Act claims based on the same

21 conduct as an underlying constitutional violation).

22

23    For example, some courts have strictly applied Shoyoye and

24 insisted that claims alleging a section 52.1 violation must show

25 ――――――――――――――――――――

26 [15] Claims under section 52.1 are commonly "brought together with federal claims under 42 U.S.C. § 1983, generally in federal

27 courts." (Allen Decl., Exh. A at 1).   Accordingly, much of the case law addressing section 52.1 comes from federal courts

28 attempting to interpret state court decisions and to anticipate how the state supreme court would rule.

"independent coercion outside their underlying constitutional claims . . . ." <u>Luong v. City & Cnty of San Francisco</u>, 2012 WL 5869561, at *8 (N.D. Cal. Nov. 19, 2012); <u>see also</u> <u>Ervin v. City of Los Angeles</u>, 2012 WL 4758224, at *2 (C.D. Cal. Oct. 5, 2012) (following <u>Shoyoye</u> and holding that to "the extent that an alleged violation of a right is inherently coercive, that coercion is insufficient to meet the statutory requirements of Section 52.1, which requires a showing of an independent threat or coercive act"). Other federal courts have sought to limit <u>Shoyoye</u> and found that plaintiffs may rely on the same coercive conduct that is an element of an offense as proof of "coercion" under section 52.1. According to these courts, "the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and that <u>Shoyoye</u> applies only when the conduct is unintentional." <u>Sanchez v. City of Fresno</u>, 2014 WL 2042058, at *16 (E.D. Cal. May 16, 2014); <u>see also</u> <u>Bass v. City of Freemont</u>, 2013 WL 891090, at *5 (N.D. Cal. Mar. 8, 2013) (a broad reading of <u>Shoyoye</u> "would, perversely, preclude any section 52.1 action in which the underlying statutory or constitutional violation involved 'threats, intimidation, or coercion'").

The split in authority has not been resolved by the California Supreme Court. <u>Davis</u>, 2014 WL 4772668, at *6. However, in March 2015, the state court of appeal in <u>Allen v. City of Sacramento</u> addressed the issue in deciding "whether an unlawful detention or arrest, without more, is sufficient to satisfy both elements of section 52.1." <u>Allen</u>, 183 Cal. Rptr. 3d at 676. The court concluded that "[p]roof of a constitutional

40

violation, by itself, is insufficient to impose liability under section 52.1" and consequently, "a wrongful arrest or detention, without more," fails under section 52.1. Id. at 678. The court of appeal's decision in Allen, while not binding on this Court, "is not to be disregarded" unless the Court is "convinced by other persuasive data that the highest court of the state would decide otherwise." Hayes v. County of San Diego, 658 F.3d 867, 871-72 (9th Cir. 2011) (quoting Estrella v. Brandt, 682 F.2d 814, 817 (9th Cir. 1982)).

Assuming that a plaintiff makes an adequate showing of individual liability, a municipality or other governmental entity may be vicariously liable under California law for its employees' violations of section 52.1, so long as the violations occurred "within the scope of the employment." Barsamian, 597 F. Supp. 3d at 1067 (quoting Lisa M. V. Henry Mayo Newhall Mem'l Hosp., 12 Cal. 4th 291, 296 (1995)); see also Burns v. City of Redwood City, 737 F. Supp. 2d 1047, 1065 (N.D. Cal. 2010) ("Unlike under the federal counterpart, the municipal defendants may be held vicariously liable for an officer's violation of section 52.1.") (citing Cal. Gov't Code § 815.2(a)); Sanchez, 914 F. Supp. 2d at 1117 (collecting cases for proposition that municipalities fall within the "purview" of section 52.1); D.V. v. City of Sunnyvale, 2014 WL 4072338, at *4 (N.D. Cal. Aug. 14, 2014) ("Courts have consistently held that public entities may be held vicariously liable for a violation of § 52.1, and, more specifically, that cities may be held vicariously liable for police officers' violations of § 52.1.").

41

Under California law, an act falls within the scope of employment where there is a "nexus between the officer's tortious conduct and his work" and it is reasonably foreseeable that an officer would commit this "type of tortious conduct in the enterprise of law enforcement." <u>Barsamian</u>, 597 F. Supp. 2d at 1068 (citing <u>Mary M. v. City of Los Angeles</u>, 54 Cal. 3d 202, 213 (1991)). The "ultimate act" need not be authorized so long as "it was committed in the course of a series of acts of the agent which were authorized by the principal."[16] <u>Barsamian</u>, 597 F. Supp. 2d at 1068-69. Whether a particular defendant acted within the scope of his employment is a question "properly left for the jury to decide." <u>Mary M.</u>, 54 Cal. 3d at 214; <u>see also</u> <u>Barsamian</u>, 597 F. Supp. 2d at 1070 (same).

Here, the Court has concluded that genuine issues of fact preclude summary judgment on Plaintiff's claims against the Individual Defendants in Claim One. Even if the Court were to adopt the holding of the <u>Allen</u> court and require an independent showing of coercion beyond the elements of Plaintiff's claims, contested issues regarding the circumstances of the traffic stop prior to Plaintiff's arrest, the veracity of the police reports addressing the events that led to the arrest, and the length of and reasons for Plaintiff's custody suggest that disputed issues of fact remain concerning the element of coercion, which

---

[16] In <u>Mary M.</u>, for example, the California Supreme Court concluded that a city employer "can be held liable under the doctrine of respondeat superior" for a rape committed by an on-duty police officer where the rape occurred in the course of a series of acts that were authorized by the city, even though the rape itself was not authorized. <u>Mary M.</u>, 54 Cal. 3d at 207 & 219.

precludes a finding that Plaintiff's section 52.1 claim fails as a matter of law.  Sialoi v. City of San Diego, 2013 WL 6410987, at *14 (S.D. Cal. Dec. 9, 2013) (summary judgment inappropriate under section 52.1 where reasonableness of the plaintiffs' arrest and detention remained in dispute).  Plaintiff has adequately raised a genuine issue of fact as to whether the Individual Defendants, and, vicariously, the City, are liable under California Civil Code section 52.1.  Accordingly, to the extent that Defendants' MSJ seeks summary adjudication on Plaintiff's state law civil rights claim, the Motion is DENIED.

**E.   The Individual Defendants Are Not Entitled To Summary Adjudication On Plaintiff's State Law Tort Claim For False Arrest/False Imprisonment In Claim Four**

In Claim Four, Plaintiff alleges that the Individual Defendants falsely arrested and falsely imprisoned him by arresting him without probable cause and by filing a falsified declaration of probable cause.  (SAC at 10).  Defendants maintain that the "uncontroverted facts would have led a reasonable officer to believe and honestly entertain a strong suspicion that [Plaintiff] committed the murders."  (MTD at 21).  Defendants further contend that probable cause did not dissipate until Rodriguez obtained Ocampo's confession on February 1, 2012.  (Id. at 22).

The California Penal Code defines "false imprisonment" as "the unlawful violation of the personal liberty of another."

Cal. Penal Code § 236.  "The Penal Code definition applies in both civil and criminal actions."  Lyons v. Fire Ins. Exchange, 161 Cal. App. 4th 880, 888 (2008).  "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief."  Easton v. Sutter Coast Hosp., 80 Cal. App. 4th 485, 496 (2000).  "A person is falsely imprisoned if he or she is wrongfully deprived of his or her freedom to leave a particular place by the conduct of another."  Snyder v. Evangelical Orthodox Church, 216 Cal. App. 3d 297, 303 (1989).  "In California, false arrest is a species of the tort of false imprisonment."  Blankenhorn v. City of Orange, 485 F.3d 463, 486 n.15 (9th Cir. 2007) (false arrest is "but one way of committing a false imprisonment") (internal quotation marks and citation omitted).

The Court has determined that the Individual Defendants are not entitled to summary judgment on Plaintiff's false arrest/false imprisonment claims under section 1983.  The same reasoning applies to his claims based on the same disputed facts under state tort law.  Accordingly, to the extent that Defendants' MSJ seeks summary adjudication on Plaintiff's state law tort claims, the Motion is DENIED.

\\
\\
\\
\\
\\

44

**F.    The Individual Defendants Are Not Entitled To Summary Adjudication On Plaintiff's Prayer For Punitive Damages**

The SAC seeks "[e]xemplary and punitive damages against each individual and Doe defendant, not against the City of Brea or the BPD, in an amount according to proof." (SAC at 11).  Defendants maintain that Plaintiff cannot make the requisite factual showing to impose punitive damages against them.  (MTD at 22-24).

"[P]unitive damages may be recovered in appropriate circumstances under § 1983." Jackson v. Barnes, 749 F.3d 755, 762 (9th Cir. 2014).  According to the Supreme Court, a jury may impose punitive damages in a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).

Plaintiff states that he is "not pursuing a punitive damage claim against Chief Conklin, and does not oppose entry of summary adjudication on that claim only." (Opp. at 25).  However, Plaintiff states that both "Rodriguez and Alonzo misrepresented evidence, lied to the Orange County Superior Court and the ODCA, and bullied exculpatory witnesses such as Shirazi." (Id.).  As such, Plaintiff maintains that the record supports a determination that Rodriguez and Alonzo acted with "reckless disregard" and "complete indifference to the plaintiff's safety or rights" to support punitive damages. (Id.).  The Court agrees

45

that genuine issues of fact preclude summary adjudication on the issue of punitive damages as to Rodriguez and Alonzo. Accordingly, Defendants' MSJ is GRANTED to the extent that it seeks dismissal of the punitive damages prayer against Conklin, but DENIED to the extent that it seeks dismissal of the punitive damages prayers against Rodriguez and Alonzo.

## VII.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication, is GRANTED IN PART and DENIED IN PART. Specifically, the Motion is DENIED with respect to the federal and state law claims and the prayer for punitive damages against the Individual Defendants. The Motion is GRANTED with respect to Plaintiff's federal constitutional claims against Policy Making Defendants City of Brea, City of Brea Police Department, and Police Chief Jack Conklin in Claim Two, which are DISMISSED WITH PREJUDICE. The prayer for punitive damages against Chief Conklin is likewise DISMISSED, to the extent that the Second Amended Complaint may be construed to raise such a claim. However, the Motion is DENIED to the extent that it seeks dismissal of Plaintiff's claim against the City under California Civil Code section 52.1. The claims against Individual Defendants Ruben Alonzo and Philip Rodriguez in Claims One, Three and Four, as well as the prayer

1   for punitive damages against them, and the claim against the City

2   in Claim Three, survive and shall proceed to trial.   Defendants'

3   Motion to Strike is DENIED.

4

5   DATED:   March 30, 2015

6                                            /S/
         SUZANNE H. SEGAL
7         UNITED STATES MAGISTRATE JUDGE